**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, Garrett S. Hassett, being sworn, state:

<u>**Introduction and Agent Background**</u>

1.      I have been employed as a Special Agent with the Federal Bureau of Investigation

("FBI") since September 2018, and am currently assigned to the Boston Field Office, Organized

Crime Drug Enforcement Task Force ("OCDETF") Strike Force.  I am a "federal law

enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure,

that is, a government agent who is engaged in enforcing the criminal laws of the United States

and within a category of officers authorized by the Attorney General to request a search warrant.

2.      Prior to my current employment with the FBI, I was employed by the Rhode Island

State Police for approximately seven years.  During that time, I worked in the uniform division

and as a member of the Domestic Highway Enforcement team.

3.      As an FBI Special Agent, I am authorized to investigate violations of the laws of

the United States, including violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession

with intent to distribute a controlled substance) and 846 (conspiracy to distribute and to possess

with intent to distribute a controlled substance) (the "Target Offenses").

4.      During my career in law enforcement, I have become familiar with the methods and

techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the

organization of drug trafficking conspiracies.  In the course of conducting criminal

investigations, I have employed the following investigative techniques: interviewing informants

and cooperating witnesses; conducting physical surveillance; conducting short-term and long-

term narcotics investigations; consensual monitoring and recording of both telephonic and non-

telephonic communications; analyzing telephone pen register and toll record data, conducting

court-authorized electronic surveillance; and preparing and executing search warrants that resulted in substantial seizures of narcotics, firearms, and other contraband.

5.     Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity.  I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.

6.     Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.  I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, and other means to facilitate their illegal activities.

## **Purposes of Affidavit**

7.     I submit this affidavit in support of the following:

   a.   An application for a criminal complaint against Anthony SMALLWOOD, a/k/a "Tony," for a violation of 21 U.S.C. §§ 841(a) and (b)(1)(B)(vi) (Distribution of and Possession with Intent to Distribute 40 Grams or More of Fentanyl) (the "Charged Offense"); and

   b.   An application for a warrant authorizing the search of 138 Heath Street, Apartment #52, Jamaica Plain, Massachusetts (the "Target Premises"),

SMALLWOOD's residence,[1] which is more fully described in Attachment A.

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is probable cause to believe that SMALLWOOD committed the Charged Offense.  Additionally, there is probable cause to believe that evidence of the Charged Offense, described more fully in Attachment B, exists in the Target Premises, described more fully in Attachment A.

## Probable Cause

### *Investigation Background*

9.      On March 4, 2019, a Cooperating Witness (hereinafter, the "CW"), who is in a position to testify, met with FBI agents and advised them that an individual known to him as "Rhonda Apple" had access to a fentanyl supplier whose product had been related to the overdose deaths of several individuals in the Boston, Massachusetts metro area.[2]

---

[1] Through a search of public records and law enforcement databases, investigators determined that SMALLWOOD's girlfriend and minor children reside at the Target Premises.  Investigators believe that the Target Premises is SMALLWOOD's primary residence.

[2] The CW is a documented source of information who has cooperated with the Drug Enforcement Administration ("DEA"), the FBI, and the Quincy Police Department in the past.  The CW has a criminal record that includes multiple arrests for drug distribution offenses and for threatening, and at least one arrest for possessing a controlled substance in a school zone or park.  The CW's criminal record also includes convictions for possessing a Class A substance with intent to distribute it (two convictions, at least one of which was for heroin), for possessing a Class D controlled substance (marijuana) with intent to distribute it, and for conspiracy to violate the Controlled Substances Act.  The CW first began to cooperate with law enforcement after being approached by officers as a potential target of a drug distribution investigation being conducted by the DEA.  Ultimately, the CW was not charged in that case.  The CW has been cooperating with the FBI for approximately one year.  The FBI has compensated the CW financially in exchange for the CW's cooperation. The CW has provided information that has

3

10.    On March 5, 2019, the CW met with the individual known as "Rhonda Apple," who introduced the CW to her fentanyl supplier, "Tony," later identified as Anthony SMALLWOOD.[3]  The CW provided SMALLWOOD with the CW's telephone number.

11.    On March 5, 2019, at approximately 9:48 p.m., the CW contacted agents to tell them that SMALLWOOD had just contacted the CW directly from telephone number 617-363-6073 and the two had an unrecorded conversation.  According to the CW, in lightly coded language, the CW and SMALLWOOD discussed arranging a future meeting where the CW would purchase fentanyl from SMALLWOOD.

12.    The next day, on March 6, 2019, at approximately 3:09 PM, the CW made a recorded telephone call to SMALLWOOD at phone number 617-363-6073.   SMALLWOOD agreed to meet the CW within a week or two to sell the CW fentanyl.  SMALLWOOD advised the CW that he was willing to sell the CW any quantity of fentanyl the CW wanted.  The following is a verbatim transcript of the telephone call between SMALLWOOD and the CW recorded by the CW's phone:

(S) Hello?

(CW) Hey brother what up?

(S) What up man?

---

been corroborated and that has led to seizures of narcotics and drug related arrests.  Information provided by the CW is believed to be reliable.

    [3] The Target was originally identified as "Tony" Last Name Unknown ("LNU").  Law enforcement identified "Tony" as Anthony SMALLWOOD through comparison of an RMV photograph of SMALLWOOD with the video surveillance of "Tony" from the controlled sales of drugs to the CW.  Agents then presented the CW with a photo-pack, described later in this affidavit.  The CW identified "Tony" as SMALLWOOD.  Based on these identifications, I have determined that that "Tony" LNU's true name is Anthony SMALLWOOD.  I refer to the target of this investigation as SMALLWOOD throughout this affidavit.

(CW) My bad I couldn't call you right away, I just got home.

(S) Alright, yup yup.

(CW) Um, I ended up getting something to hold me for a few days, right?

(S) Yup.

(CW) So, I don't even, I'm not even gonna ask you for a sample. I'm gonna…

(S) You said what?

(CW) I'm not even gonna ask you for a sample. I'm gonna go by your word.

(S) Yup.

(CW) And I'm gonna call you as soon as I'm done with this. Putting all my money together.

(S) Yup.

(CW) And I'm gonna hit you up.

(S) Alright yup, just let me know.

(CW) Alright let me tell you this. So we don't waste each other's time before then. What I'm getting right now, I'm making seven out of one.

(S) Yeah, but is, it's good, good?

(CW) Everybody gives me an eight.

(S) You said an eight?

(CW) From one to ten, everybody gives me an eight.

(S) Oh, alright, alright.

(CW) So, can you top that?

(S) Yeah, most likely. Just when you're ready, when you're ready you call me and then we go from there.

(CW) Okay, alright. So I'll be calling you by the Monday, or probably Sunday.

(S) Alright.

(CW) Alright brother.

13.     Based on the investigation, I believe that SMALLWOOD and the CW discussed arrangements for a future drug transaction and discussed the quality of the drugs SMALLWOOD would sell the CW.  At the beginning, the CW stated that he did not need a sample of SMALLWOOD's drugs, but would trust him that the drugs were high quality ("I'm not even gonna ask you for a sample. I'm gonna go by your word.").  The CW stated that he was "making seven out of one," meaning that he was receiving drugs that he could "cut" seven times and resell.  The CW and SMALLWOOD then discussed selling the CW an "eight" out of "ten," meaning drugs that could be cut eight times and resold.

*March 13, 2019:  SMALLWOOD Met the CW Near the Target Premises, Supplied the CW with*
*40 Grams of Suspected Fentanyl, and Entered a Building Near the Target Premises Immediately*
*After the Transaction*

14.     On March 13, 2019, at 1:54 p.m., the CW received a text message from telephone number 781-366-6257 (the "Target Phone"), which stated, "Got something that can hold 10." "This is my new number."  The CW informed agents that this text message was from SMALLWOOD and that he had changed his phone number.  This text message has been preserved.  Based on the investigation, I believe that SMALLWOOD reported to the CW that the fentanyl could be "cut" up to ten times and resold.   At 3:47 p.m., the CW made a recorded telephone call to the Target Phone and spoke to SMALLWOOD.  In lightly coded language, the CW and SMALLWOOD discussed the sale price of fentanyl.  SMALLWOOD told the CW that the price of one gram was $85 for a "10" (scale of 1-10) or $70 for a "7" (scale of 1-10).  Agents understood a "10" and a "7" to mean that the drugs, likely fentanyl, could be "cut" with cutting agents ten or seven times, respectively, and resold.

15.   On March 13, 2019, at approximately 4:24 p.m., the CW made a recorded telephone call to the Target Phone and spoke to SMALLWOOD.  In lightly coded language, the CW requested four "fingers," or 40 grams of fentanyl for $70 a gram of fentanyl.  SMALLWOOD agreed to meet the CW between 6:30 and 7:00 p.m. on the same day to conduct the transaction. The following is a verbatim transcript of the recorded telephone call between SMALLWOOD and the CW on the Target Phone:

(S) Hello?

(CW) Yo what up brother?

(S) What up?

(CW) Not much, not much, just getting out of work.

(S) Alright.

(CW) Uh, you never told me about price. That way I know what I'm doing.

(S) Yeah, well these people, they said it…well I already grabbed something and shit like that. But it holds ten, so on ten you can do a hundred. But I usually do ninety, you know what I mean?

(CW) Yeah, I usually do like between [UI]…

(S) You said what?

(CW) …[UI] ten, you know?

(S) You said what?

(CW) When it's ten, I usually put seven and a half.

(S) Yeah, yeah. Just so it can still be fire, exactly.

(CW) Seven, seven. Yeah, yeah, yeah. I don't want nothing commercial. I want something that is a little better, so I can…

(S) Oh yeah.

(CW) So I can work with that one, I can work with that. That's what I'm looking for. So…

(S) Alright.

(CW) What's the number on that one?

(S) It's eighty five. Yeah son, it's expensive. Or I can get, or I can get something for seventy, but not with seven.

(CW) Seven. Let me talk to [UI] and I think we're going to have to go with the seventy because the money we have, but let me talk to him and I'll get right back to you.

(S) What?

(CW) Let me call [UI] to see what he wants to do. I want to explain what's going on with the seven and then ten, to see what he says.

(S) Alright yup just let me know.

(CW) Alright brother.

(S) Alright.

16.     Based on the investigation, I believe that the CW and SMALLWOOD negotiated the price and quality of the drugs he was set to purchase.  The CW argued for a price of $70 a gram of fentanyl for a quality of "seven," meaning the fentanyl could be "cut" seven times and resold.  SMALLWOOD pushed for $85 a gram of fentanyl, but eventually agreed to the CW's price and quality ("I think we're going to have to go with the seventy because the money we have.").  SMALLWOOD also referred to the drug quality as "fire," meaning it was high quality and could be "cut" multiple time and resold.

17.     At approximately 6:45 p.m., the CW met with agents at a predetermined location. At approximately 7:05 p.m., the CW made a recorded call to the Target Phone and spoke with SMALLWOOD.  In lightly coded language, SMALLWOOD agreed to sell the CW four "fingers," or 40 grams of fentanyl for $70 a gram, or $2,800 total.  SMALLWOOD told the CW to meet him at Walden Street, Jamaica Plain, Massachusetts.  Agents searched the CW and the CW's vehicle for contraband and currency with negative results.  The CW was equipped with an audio/video recording device.  Agents also provided the CW with $2,800 in Official Agency

8

Funds ("OAF").  At 7:16 p.m., the CW left the predetermined location and drove to the meeting

location.  Agents surveilled the CW during the drive from the predetermined location to the

meeting location with SMALLWOOD.  While in traffic, the agents lost sight of the CW's

vehicle for short periods of time, but always quickly reestablished contact.

18.    At approximately 7:44 p.m., the CW made a recorded telephone call to the Target

Phone and spoke to SMALLWOOD.  SMALLWOOD initially told the CW to meet him on

Walden Street then shortly after changed the meeting location to 154 Heath Street, Jamaica

Plain, Massachusetts, which a building in the same apartment complex as the Target Premises.

At approximately 7:50 p.m., surveillance agents observed a male in a red hooded sweatshirt

standing at the doorway of 154 Heath Street.

19.    The CW then observed SMALLWOOD near 154 Heath Street waving at the CW.

The CW pulled his vehicle to the side of the road and agents observed SMALLWOOD enter the

CW's vehicle.  SMALLWOOD asked the CW if he was "legit," meaning not a police officer.

The CW assured SMALLWOOD that he was not a police officer.  The CW then gave

SMALLWOOD the $2,800 in OAF.  SMALLWOOD handed the CW a package believed to be

fentanyl.  SMALLWOOD stated that it was "the stuff that takes 7."  Based on the investigation,

agents believe that SMALLWOOD reported to the CW that the suspected fentanyl could be

"cut" seven times with cutting agents and resold.  SMALLWOOD told the CW to drive around

the rotary on Heath Street and told the CW that he could get the CW "10."  Based on the

investigation, agents believe that SMALLWOOD reported to the CW that he could sell the CW

fentanyl that could be "cut" ten times and resold.  In lightly coded language, SMALLWOOD

also told the CW that he could sell the CW crack cocaine, cocaine, or anything else the CW

needed.  At approximately 7:56 p.m., SMALLWOOD exited the CW's vehicle, and entered 154

Heath Street.  The CW then drove back to the predetermined location.

20.    At the predetermined location, the CW provided the agents with the suspected

fentanyl.  Agents searched the CW and the CW's vehicle for additional contraband and currency

with negative results.  Agents conducted a field test of the suspected fentanyl and it yielded

inconclusive results.  Based on my training and experience an inconclusive result does not mean

the substance does not contain fentanyl.  Based on my training and experience and the physical

appearance of the suspected fentanyl, I believe the substance to contain fentanyl.  The suspected

fentanyl has been sent to the Drug Enforcement Administration's Northeast Laboratory for

testing, and the results remain pending.

*March 26, 2019:  SMALLWOOD Supplied the CW with 80 Grams of Suspected Fentanyl and*
*Entered the Target Premises Immediately After the Transaction*

21.    On March 18, 2019, the CW advised law enforcement that SMALLWOOD sent

several text messages from the Target Phone to the CW asking when the CW wanted to purchase

more drugs (believed to refer to fentanyl).  These text messages were preserved.  At agents'

direction, at approximately 6:50 p.m., the CW made a consensually recorded phone call to

SMALLWOOD at the Target Phone.  In lightly coded language, SMALLWOOD agreed to sell

the CW 80 grams of drugs, believed to be fentanyl, the following week.

22.    On March 24, 2019, at approximately 3:30 p.m., the CW received a text message

from SMALLWOOD from the Target Phone.  SMALLWOOD reported to the CW that he had

better quality drugs and that his customers reported that the drugs, believed to be fentanyl, were

8 out 10 quality.  These text messages were preserved.  At agents' direction, at approximately

5:33 p.m., the CW made a recorded phone call to SMALLWOOD at the Target Phone.  The CW

asked SMALLWOOD if the drugs were was higher quality.  SMALLWOOD assured the CW

that the drugs were better and that his customers gave it an 8 out of 10 rating.  The CW offered to

buy 100 grams if SMALLWOOD could negotiate on the price.  SMALLWOOD stated that he

would call his uncle and then call the CW back.  The CW also asked SMALLWOOD for a

sample of "hard," meaning crack cocaine.  SMALLWOOD stated multiple times, "I got it."

Based on this investigation, I believe SMALLWOOD was referring to fentanyl in this text

message exchange with the CW.

23.    On March 25, 2019, at approximately 5:42 p.m., the CW received a text message

from SMALLWOOD from the Target Phone.  In lightly coded language, SMALLWOOD stated

that the price of drugs, believed to be fentanyl, would be $60 per gram for the "8 out of 10"

quality product.  These text messages were preserved.  At approximately 6:05 p.m., the CW

made a recorded call to SMALLWOOD at the Target Phone. In lightly coded language, the CW

told SMALLWOOD that the CW wanted 100 grams of drugs, referring to fentanyl.

SMALLWOOD asked if the CW wanted the drugs that day.  The CW said that the CW wanted

to meet around noon the following day.  SMALLWOOD agreed to meet at noon the next day and

said he would call the CW with a meeting location.  SMALLWOOD asked the CW if the CW

was sure the CW wanted 100 grams.  The CW stated that the CW was sure.  SMALLWOOD

said, "Alright."

24.    On March 26, 2019, at approximately 11:15 a.m., the CW met with agents at a

predetermined location.  The CW told agents that SMALLWOOD had agreed to sell 100 grams

of fentanyl for $60.00 per gram, and that it could make "8 out of 1."  Based on the investigation,

investigators believe that SMALLWOOD stated to the CW that one gram of suspected fentanyl

could be "cut" up to eight times and resold.  Agents searched the CW and the CW's vehicle for

contraband and currency with negative results.  Agents fitted the CW with a transmitter and an audio/video recording device and provided the CW with $6,000 in OAF to purchase the fentanyl.

25.    At 12:01 p.m., the CW made a recorded call to SMALLWOOD at the Target Phone.  SMALLWOOD advised he would be back in the area around 12:30 p.m. and stated that he did not have the "hard," meaning the sample of crack cocaine, on him.

26.    At 1:00 p.m., SMALLWOOD called the CW from the Target Phone and told the CW to meet him in two or three minutes on Walden Street.  At 1:04 p.m., the CW made a recorded call to SMALLWOOD at the Target Phone and stated the CW was at 42 Walden Street. At 1:16 p.m., agents observed SMALLWOOD enter the CW's vehicle on Walden Street.  At 1:18 p.m., agents observed SMALLWOOD exit the CW's vehicle and walk down Heath Street. At 1:21 p.m., agents observed SMALLWOOD enter the Target Premises through a first-floor door marked "52."

27.    At 1:30 p.m., the CW met agents at the predetermined location.  The CW immediately turned over the suspected fentanyl purchased from SMALLWOOD to agents and was subsequently searched for contraband and currency with negative results.  The CW told agents that SMALLWOOD handed him the suspected fentanyl in exchange for $6,000 in OAF.

28.    Shortly after the sale was completed, SMALLWOOD contacted the CW via text message from the Target Phone and told the CW that he had given the CW "the wrong package." SMALLWOOD stated that the package given to the CW was meant for someone else and had already been "cut," meaning diluted using filler substances.  Because the fentanyl given to the CW was not as "pure" as what the CW had paid for, SMALLWOOD agreed to meet with the CW the next day to give him additional fentanyl to make up the difference.   The CW also told agents that SMALLWOOD stated that he would give the CW a sample of crack cocaine after he

12

cooked it.  SMALLWOOD told the CW that with 28 grams of cocaine he could produce 38

grams of crack cocaine.  These text message from SMALLWOOD to the CW were preserved.

29.    During this meeting, agents presented the CW with an eight-pack photo line-up in

an attempt to positively identify SMALLWOOD.  This line-up was created by the FBI Boston

photography unit and included eight individual photographs.  The CW was advised that

SMALLWOOD may or may not be included in the line-up and was instructed to view all eight

photographs prior to advising if the CW recognized any photograph as the person who he had

been meeting with to conduct drug transactions.  After reviewing all eight photographs, the CW

identified photograph #5 as the individual he knew to be "Tony" from the drug transactions

described above.  Photograph # 5 was an RMV photograph of Anthony T. SMALLWOOD,

DOB: 08/06/1990.

30.    Agents transported the packages of suspected fentanyl directly back to the FBI

Chelsea, Boston Field Office. The fentanyl was packaged in two clear plastic bags. A brown

powder consistent in appearance and texture to fentanyl was inside the clear plastic bags.  Agents

conducted a presumptive field test which yielded an inconclusive result.  Based on my training

and experience, an inconclusive result does not mean the substance does not contain fentanyl.

Based on my training and experience, and the physical appearance of the suspected fentanyl, I

believe the substance to contain fentanyl.  The suspected fentanyl has been sent to the Drug

Enforcement Administration's Northeast Laboratory for testing.

*March 28, 2019: SMALLWOOD Supplied the CW with Suspected Fentanyl and a Sample of*

*Crack Cocaine near the Target Premises*

31.    Because SMALLWOOD supplied the CW with the wrong quality of suspected

fentanyl on March 26, 2019, in a series of recorded calls, at the direction and under the

13

supervision of agents, the CW arranged to meet with SMALLWOOD so that SMALLWOOD

could provide additional drugs to the CW to make up for his mistake.

32.   On March 27, 2019, the CW met with SMALLWOOD to receive the additional

drugs but SMALLWOOD stated that he did not have them yet.  SMALLWOOD told the CW

that he drove to Lawrence, Massachusetts earlier in the day and paid for 200 grams of fentanyl,

but that the product had not yet arrived.  SMALLWOOD told the CW he wanted to keep the

business between them good and would give the CW 100 grams of fentanyl to make up for his

mistake of giving the CW the wrong product on March 26, 2019.  SMALLWOOD told the CW

he does not like to drive with fentanyl because he "did eight years" for a previous drug charge.

The CW and SMALLWOOD arranged to meet the following day to conduct the transaction.

33.   On March 28, 2019, the CW met with agents at a predetermined meeting location.

Agents searched the CW and the CW's vehicle for contraband and currency with negative

results.  Agents fitted the CW with a transmitter and an audio/video recording device.

34.   At 12:02 p.m., surveillance agents observed SMALLWOOD outside of the Target

Premises.  Agents observed him walk down Heath Street.  At 12:32 p.m., SMALLWOOD called

the CW from the Target Phone and told the CW that SMALLWOOD's suppliers were 25

minutes away.  At approximately 1:16 p.m., the CW made a call to SMALLWOOD at the Target

Phone which went unanswered.  At approximately 1:17 p.m., SMALLWOOD called the CW

from the Target Phone and told the CW that he would be available in five to ten minutes.

35.   Agents surveilled the CW to the meeting location.  At 2:10 p.m., agents observed

SMALLWOOD enter into the front passenger seat of CW's vehicle.  At 2:12 p.m., agents

observed SMALLWOOD exit the CW's vehicle.

14

36.    At 2:25 p.m., the CW arrived back at the predetermined meeting location and turned over the suspected fentanyl and a sample of crack cocaine to agents.  Agents searched the CW and the CW's vehicle for contraband and currency with negative results.  The CW told agents that SMALLWOOD had provided the suspected fentanyl and crack cocaine to him during their meeting in the CW's vehicle.  SMALLWOOD told the CW that the fentanyl was "supposed to take 7."  Based on this investigation, agents believe that SMALLWOOD reported to the CW that the suspected fentanyl should be mixed with seven grams of "cut."  SMALLWOOD also stated that "to make it good," the CW should only use "four or four and a half" grams of cut.  SMALLWOOD told the CW that the mistake that occurred on March 26, 2019, would not happen again.  The CW told agents that SMALLWOOD had the suspected fentanyl in his hand and retrieved the suspected crack cocaine from his pocket.  The sample of crack cocaine provided to the CW was described as two "$40 bags."  During the drug transaction, SMALLWOOD told the CW he saw "too many weird vehicles" in the area of Heath Street and if he sees something "weird," he will flee to the Dominican Republic.  Agents understood this to mean that SMALLWOOD would flee to the Dominican Republic if he believed law enforcement was watching him.

37.    Agents transported the packages of suspected fentanyl and crack cocaine directly back to the FBI Chelsea, Boston field office. The suspected fentanyl was packaged in one clear plastic bag.  A brown powder consistent in appearance and texture to fentanyl was inside the clear plastic bag. The suspected crack cocaine was packaged in two clear plastic bags.  A white rock-like substance consistent in appearance and texture to crack cocaine was inside of the clear plastic bags.  A presumptive field test of the suspected fentanyl yielded an inconclusive result. Based on my training and experience, and the physical appearance of the suspected fentanyl, I

15

believe the substance to contain fentanyl.  The suspected fentanyl has been sent to the Drug

Enforcement Administration's Northeast Laboratory for testing, and the analysis remains

pending.

38.    A presumptive field test of the suspected crack cocaine yielded a positive result for

cocaine base.  Based on my experience and training, and the physical appearance of the

suspected drugs, I believe the substance to contain crack cocaine.

*April 17, 2019:  SMALLWOOD Supplied the CW with 50 Grams of Suspected Fentanyl near the*

*Target Premises*

39.    On April 16-17, 2019, at agents' direction, the CW contacted SMALLWOOD at the

Target Phone and arranged another drug transaction for the purchase of 50 grams of fentanyl for

$3,000.  On April 17, 2019, agents met the CW at a predetermined location.  The CW and the

CW's vehicle were searched for contraband and currency with negative results. The CW was

fitted with a transmitter and an audio/video recording device.  Agents also provided the CW with

$3,000 in OAF to purchase the drugs from SMALLWOOD.

40.    At 4:04 p.m., the CW left the predetermined meeting location.  At 4:11 p.m., the

CW made a recorded telephone call to SMALLWOOD at the Target Phone and told

SMALLWOOD that the CW was approximately 15 minutes away.  SMALLWOOD told the CW

to meet him near Walden Street when the CW arrived.

41.    At 4:32 p.m., the CW made a recorded telephone call to SMALLWOOD at the

Target Phone.  SMALLWOOD told the CW to meet SMALLWOOD on Walden Street.  At 4:53

p.m., the CW made a recorded telephone call to SMALLWOOD at the Target Phone.

SMALLWOOD told the CW that he was walking to the CW's location.  At 4:59 p.m., agents

observed SMALLWOOD walking toward the CW's location on Heath Street.  SMALLWOOD

then entered the CW's vehicle.  This meeting was recorded.  At 5:04 p.m., agents observed

SMALLWOOD exit the CW's vehicle.

42.     At 5:21 p.m., the CW returned to the predetermined location and turned over the

suspected fentanyl to agents.  Agents searched the CW and the CW's vehicle for contraband and

currency with negative results.  The CW told agents that SMALLWOOD had provided

approximately 50 grams of fentanyl for $3,000 in OAF.  SMALLWOOD told the CW that he

wanted to cut out SMALLWOOD's uncle from the business and knew of a source who sold

"China White," meaning fentanyl.  SMALLWOOD stated that he wanted to go into business

"50/50" with the CW.  SMALLWOOD told the CW he wanted to put money together with the

CW to purchase 400 grams of fentanyl for $10,000.  SMALLWOOD told the CW he would

provide the CW with a sample of the "China White" so the CW could "try it with his people."

43.     Agents transported the packages of suspected fentanyl directly back to the FBI

Chelsea, Boston Field Office. The suspected fentanyl was packaged in one clear plastic bag.  A

brown powder consistent in appearance and texture to fentanyl was inside the clear plastic bag.

A presumptive field test of the suspected fentanyl yielded an inconclusive result.  Based on my

training and experience, and the physical appearance of the suspected fentanyl, I believe the

substance to contain fentanyl.  The suspected fentanyl has been sent to the Drug Enforcement

Administration's Northeast Laboratory for testing, and the analysis remains pending.

*May 10, 2019:  SMALLWOOD Exited the Target Premises, Supplied the CW with 100 Grams of*

*Suspected Fentanyl, and Entered the Target Premises Immediately After the Transaction*

44.     On May 9, 2019, the CW made two recorded calls to SMALLWOOD.  In lightly

coded language, SMALLWOOD agreed to sell 100 grams of fentanyl to the CW.  During one of

the phone calls, the CW asked SMALLWOOD if "he was good for tomorrow morning".

SMALLWOOD stated that he was ready now and that SMALLWOOD had his uncle drop off the drugs that morning.  SMALLWOOD told the CW he "didn't want to hold it 'til the morning."  The CW told SMALLWOOD he would make a phone call and get back to SMALLWOOD in regard to when he could pick up the fentanyl.

45.    On May 10, 2019 at approximately 11:15 a.m., the CW met agents at a predetermined location.  The CW and the CW's vehicle were searched for contraband and currency with negative results. The CW was fitted with a transmitter and an audio/video recording device.  Agents also provided the CW with $5,000 in OAF to purchase the drugs from SMALLWOOD.

46.    At approximately 11:20 a.m., SMALLWOOD called the CW from the Target Phone and told the CW that he had 100 grams of fentanyl.  The CW advised SMALLWOOD that he only had $5,000.  SMALLWOOOD told the CW that he would speak with his uncle to determine whether SMALLWOOD could sell the CW the drugs at $50 per gram. SMALLWOOD told the CW to meet him on Walden Street, Jamaica Plain.  This call was on speaker phone and recorded via the body recording device.

47.    At 11:34 a.m. the CW departed the predetermined location and drove to Walden Street to meet with SMALLWOOD.  At approximately 11:50 a.m., SMALLWOOD contacted the CW from the Target Phone and in lightly coded language, told the CW that his uncle wanted to sell the fentanyl at $60 per gram.  SMALLWOOD stated that the difference would have to come out of SMALLWOOD's pocket.  At 11:57 a.m., The CW contacted SMALLWOOD and told him he was at the meeting location on Walden Street.

48.    At approximately 12:01 p.m., agents observed SMALLWOOD exit the Target Premises.  Agents observed SMALLWOOD walk from the Target Premises to the meeting

location.  At approximately 12:18 p.m., agents observed SMALLWOOD enter the CW's vehicle.

Once inside the vehicle, SMALLWOOD again stated that his uncle wanted to sell the fentanyl

for $60 per gram, but because SMALLWOOD had messed up the March 26, 2019 drug order,

SMALLWOOD would sell it to the CW for $50 per gram.  SMALLWOOD told the CW that he

could "cut" the fentanyl up to 10 times to make one kilogram out of 100 grams.  SMALLWOOD

informed the CW that whatever the CW needed, SMALLWOOD's uncle had it, and

SMALLWOOD could provide it to the CW.  The CW told agents that SMALLWOOD had

provided approximately 100 grams of fentanyl for $5,000 in OAF.

49.    At approximately 12:23 p.m., agents observed SMALLWOOD exit the CW's

vehicle.  Approximately two minutes later, agents observed SMALLWOOD enter the Target

Premises.  The CW drove back to the predetermined meeting location to meet with agents.

When the CW returned to the predetermined location, he turned over the suspected fentanyl to

agents.  Agents searched the CW and the CW's vehicle for contraband and currency with

negative results.

50.    Agents transported the packages of suspected fentanyl directly back to the FBI

Chelsea, Boston Field Office. The fentanyl was packaged in two clear plastic bags.  A brown

powder consistent in appearance and texture to fentanyl was inside the clear plastic bags.  A

presumptive field test of the suspected fentanyl yielded an inconclusive result.  Based on my

training and experience, and the physical appearance of the suspected fentanyl, I believe the

substance to contain fentanyl. The suspected fentanyl has been sent to the Drug Enforcement Administration's Northeast Laboratory for testing.

### Drug Traffickers' Use of Residences and Cell Phones Generally

51. Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a. Controlled substances.

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets

such as motor vehicles, real property, and commercial storage facilities.

g.      Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

52.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an

21

extended period of time, regardless of whether they are physically in possession of drugs on the premises.

53.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

54.    Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

55.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

56.    Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug

traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

57.    During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

58.    Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  As described above, SMALLWOOD used a cellular telephone to communicate with the CW to arrange drug purchases.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of

electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

59.    Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS")

technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

60.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

61.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones

today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular

phone can provide valuable evidence as to the locations where drug traffickers meet with

coconspirators, including their sources of supply, and can aid in identifying those individuals.

Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers

store drugs, maintain bank accounts, and conceal their drug proceeds.

62.    Based upon my training and experience, and information provided to me by others

involved in the forensic examination of computers, I know that electronic data on cellular

telephones can be stored in a variety of methods, including, but not limited to, within the

memory of the cellular telephone; within volatile memory, such as RAM; or on removable

media, such as memory cards.  I also know that electronic data can often be recovered months or

even years after it has been written, downloaded, saved, deleted, or viewed locally or over the

internet.  This is true because:

a.    Electronic files that have been downloaded to a storage medium can be stored for
years at little or no cost.  Furthermore, when users replace their electronic equipment,
they can easily transfer the data from their old device to a new one.

b.    Even after files have been deleted, they can be recovered months or years later
using forensic tools.  This is so because when a person "deletes" a file on a device, the
data contained in the file often does not actually disappear; rather, that data remains on
the storage medium until it is overwritten by new data, which might not occur for long
periods of time.  In addition, the device's operating system may also keep a record of
deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, electronic storage media often contains
electronic evidence of how the device has been used, what it has been used for, and who
has used it.  This evidence can take the form of operating system configurations, artifacts
from operating system or application operation; file system data structures, and virtual
memory "swap" or paging files.  It is technically possible to delete this information, but
users typically do not erase or delete this evidence because special software is typically
required for that task.

d.    Similarly, files that have been viewed over the Internet are sometimes
automatically downloaded into a temporary Internet directory or "cache."  The browser

on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

63.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B, will be found in the Target Premises, described in Attachment A.

**Request for Night-Time Search Warrant**

64.     The Target Premises is located in a high-crime area with numerous reports of gun shots fired and other violent crimes in the recent past.  The Target Premises is located within a larger apartment building with multiple units.  The street approaches to the Target Premises are constricted and law enforcement will likely be observed if they move into position to execute the search of the Target Premises during the daytime hours.

65.     On September 4, 2018, SMALLWOOD was shot in the chest by an unknown assailant a short distance from the Target Premises.  The shot spotter reported eight rounds and officers recovered nine shell casings in the area of 162-170 Heath Street, a short distance from the Target Premises.

66.     On May 18, 2019, law enforcement responded to reports of shots being fired near the Target Premises.  After searching the scene, officers reviewed surveillance footage from the housing complex.  On the surveillance footage, officers observed SMALLWOOD firing numerous shots into the air.  SMALLWOOD then walked into an apartment in the complex and exited without the weapon.  He then entered the Target Premises.

67.     Executing the requested search warrant during night-time hours would ensure that fewer pedestrians were in the area, lower the chance that law enforcement would be observed on their approach, and decrease the chances of a violent encounter.  Additionally, school buses

27

regularly drive through the area starting at 6:00 a.m. Executing the warrant at night-time would ensure that school buses are not present in the area.

68.     Because of the history of violent crimes in the area, SMALLWOOD's gunshot injury in September 2018, and the video evidence that SMALLWOOD possessed and fired a weapon recently, I believe good cause exists to execute this warrant at any time in the day or night based on officer safety considerations. I, therefore, request this Court to allow law enforcement to execute this search warrant at any time in the day or night because good cause has been established.

## CONCLUSION

69.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that SMALLWOOD has committed violations of the Target Offenses, including the Charged Offense, and that in the Target Premises, described in Attachment A, there exist evidence, fruits, and instrumentalities of the Target Offenses, as set forth in Attachment B. Accordingly, I respectfully request that a criminal complaint and arrest warrant be issued for SMALLWOOD, and a search warrant be issued for the search of the property described in Attachment A, for the items set forth in Attachment B.

70.     I further request that this Court allow law enforcement to execute the requested search warrant at any time day or night because good cause has been established.

71.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, except that the government may produce them in criminal discovery. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.

Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Garrett S. Hassett, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on May 21, 2019.

Hon. Donald L. Cabell
United States Magistrate Judge

29

**ATTACHMENT A**

The premises to be searched is 138 Heath Street, Apt. # 52, Jamaica Plain, Massachusetts (the "Target Premises"). The Target Premises is located within a multi-unit apartment complex.  The unit is "52" on the front door facing Heath Street.  The building is a multi-story brick structure. The Target Premises is on the first floor and can be accessed from Heath Street through the front door.  Two photographs of the Target Premises are included below.



**View from Heath Street**



**View of the front entrance**

**Attachment B—Items to be Seized**

All records, in whatever form, from January 2019 to present, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841 (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to distribute controlled substances) (the "Target Offenses").

1. Illegal controlled substances, including but not limited to, fentanyl.

2. Paraphernalia for packaging and distributing controlled substances, including but not limited to, plastic bags and scales.

3. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

5. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

6. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle.  Such identification evidence is typical of the articles people

3

commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

8.  Cellular telephones, used by or belonging to Anthony SMALLWOOD, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

    a.  Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

    b.  Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c.  Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

    d.  Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    e.  GPS data;

    f.  Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    g.  Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    h.  All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

    i.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

4